OMNIPOINT COMMUNICATIONS, INC., Plaintiff,

v.

CITY OF SCRANTON and Zoning Hearing Board of City of Scranton, Defendants.

No. 3:CV–97–0562.

United States District Court, M.D. Pennsylvania.

Jan. 26, 1999.

James A. Swetz, Stroudsburg, PA, for plaintiff.

Edmund J. Scacchitti, Scranton, PA, for defendant.

## MEMORANDUM

VANASKIE, District Judge.

Plaintiff Omnipoint Communications, Inc. (Omnipoint) filed this action under 42 U.S.C. § 1983 and the Telecommunication Act of 1996, 47 U.S.C. § 332(a)(7), contending that the defendants, City of Scranton and its Zoning Hearing Board (hereinafter collectively referred to as the Zoning Board), improperly denied Omnipoint's request to place commercial communications antennae on a two story building in a "Commercial—Neighborhood" (C–N) zoned area. (Dkt. Entry 1.) In its complaint, Omnipoint sought mandamus relief in addition to monetary damages. On July 10, 1997, Omnipoint moved for summary judgment and a writ of mandamus. (Dkt. Entry 7.)[1] On November 21, 1997, Magistrate Judge Raymond J. Durkin issued a Report and Recommendation, finding that the Zoning Board had violated the Telecommunications Act and recommending that the Zoning Board be ordered to allow Omnipoint to place its antennae upon the two story building in the C–N district. On December 4, 1997, the Zoning Board filed objections to Magistrate Judge Durkin's Report and Recommendation. (Dkt. Entry 16.) Because the Zoning Board's written decision is supported by substantial evidence, did not prohibit wireless communication services, and did not unreasonably discriminate between functionally equivalent wireless service providers, Omnipoint's motion for summary judgment will be denied. Moreover, because it is entitled to judgment in its favor, sum-

---

1. The summary judgment motion did not relate to Omnipoint's claim for damages under 42 U.S.C. § 1983; rather, it pertained solely to the alleged violation of the Telecommunications Act of 1996.

mary judgment will be granted to the Zoning Board.

## I. BACKGROUND[2]

On January 24, 1997, Jean E. Simchak, as an agent of Omnipoint, applied to the Zoning Board for permission to install commercial communications antennae on a property situated at 139 West Market Street, Scranton, Pennsylvania. (Plf's SMF (Dkt. Entry 9) ¶ 4.) [3] The antennae were intended to be part of a wireless digital phone system.[4] Through a lease arrangement, the owner of the property consented to the placement of the antennae upon his property. (*Id.* ¶ 5.) On January 24, 1997, Ronald F. Kitlas, a zoning code enforcement officer, denied the application to install the antennae, finding that the proposed use was only permitted in a C–N district if the antennae were placed upon a non-residential building in excess of five stories. (*Id.* ¶ 6.) Omnipoint then applied to the Zoning Board for a variance to allow the placement of antennae within the C–N district on the two-story residential building. (*Id.* ¶ 7.) On March 13, 1997, a Zoning Board hearing was conducted, at which time Omnipoint amended its application to include an appeal of the zoning code enforcement officer's denial of its initial application. (*Id.* ¶ 8.)

At the hearing, Omnipoint presented several witnesses who had been involved in the search for "cell" sites throughout the Scranton area. According to these witnesses, they were unable to find any building that was more than five stories within the "target" area that encompassed the C–N district. Moreover, the witnesses testified that the possible location of the cell site was limited because each cell site had to be within a certain distance of the adjoining cell sites in order to form a communication grid. Omnipoint presented evidence in the form of graphs to demonstrate that the potential areas were limited and that it was required to construct and maintain a cell site every couple of miles. If there was a gap within the grid, then a user of the digital communication service would find a "hole" in the coverage, *i.e.*, there would be no reception within a certain area in Scranton or the reception would be poor.

Several citizens testified in opposition to Omnipoint's request. First, Claire Mulrooney, a local property owner, testified that she believed that the antennae would be detrimental to the historic nature of the community. Second, an adjoining property owner, James Cusick, testified that allowing the antennae would threaten the visual appearance of the neighborhood, that individuals would avoid the area because of the perceived health risks and that there was a danger of lightening strikes.[5] Finally, Joseph Fadden,

2. In support of its motion for summary judgment, Omnipoint filed a Statement of Material Facts (SMF) as required under Local Rule 56.1. (Dkt. Entry 9.) The Zoning Board did not respond to this statement of material facts. Therefore, under Local Rule 56.1, the material facts set forth in Omnipoint's statement are deemed admitted.

3. Each antenna was approximately 63 inches high by 6 inches wide and 2.7 inches in depth. (Findings of Fact (Dkt. Entry 9) Ex. D, ¶ 13.) Apparently, six antennae were proposed to be place upon the roof of the subject building.

4. A brief description of the manner in which personal wireless services antennae and towers operate is instructive. As recently explained by one court:

> [Personal Communication Services] and wide area [specialized mobile radio services] operate by transmitting low power radio signals between mobile, wireless units and fixed antennae mounted on towers, buildings, or other structures. Signals generated by mobile transmitters are fed to electronic cabinets at the base of the antennae, where they are connected to telephone lines, over which the transmission is routed to ordinary telephone equipment located anywhere in the world. A single antenna and its related equipment cabinet are called a "cell site."
>
> The distance over which the low-power signals emitted by mobile transmitters may be effectively broadcast to fixed, cell site antennae is limited to a relatively small geographic area, called a "cell." Accordingly, an overlapping, interconnected quilt of cells must be stitched together to provide seamless coverage. Where there is a "gap" in the pattern, the user's call is "dropped" or "disconnected."

*Sprint Spectrum L.P. v. Jefferson County,* 968 F.Supp. 1457, 1460 (N.D.Ala.1997).

5. One of Omnipoint's witnesses indicated that the antennae were grounded such that lightening strikes were not a valid concern. Furthermore, the Telecommunications Act of 1996 specifically provides that health care concerns cannot form the basis for a denial of an application to con-

the President of the North Scranton Neighborhood Association, testified that his organization opposed Omnipoint's application because the antennae would have a negative impact upon the neighborhood. Moreover, Mr. Fadden also opined that Omnipoint's difficulties were self-created in that there were other potential means through which its coverage could be obtained.

At the conclusion of the hearing, the Zoning Board denied Omnipoint's appeal and its request for a variance by a three to one vote. (Def's SMF (Dkt. Entry 9.)) On January 18, 1997, the Zoning Board, through its solicitor, Edmund J. Scacchitti, mailed a letter to Omnipoint, indicating that its decision to deny its application was based upon: (1) the fact that antennae are not allowed upon buildings within a C–N district unless the buildings are greater than five stories; and (2) that Omnipoint had failed to demonstrate a hardship that would warrant a variance. (Mar. 18, 1997 Letter (Dkt. Entry 9) Ex. B.) This letter indicated that a more comprehensive opinion would be provided within 45 days. (*Id.*)

On April 28, 1997, Attorney Scacchitti issued findings of fact and conclusions of law, reiterating the Zoning Board's determination. (Apr. 28, 1997 Opinion (Dkt. Entry 9) Ex. C.) [6] The Zoning Board explained that its decision, foreclosing Omnipoint from installing antennae where Omnipoint claimed they had to be placed, was not contrary to the Telecommunications Act of 1996 because: (1) communications antennae were not "essential services" that are permitted in a C–N district; (2) there was no total ban on the placement of communications antennae in Scranton; and (3) Omnipoint had failed to demonstrate an undue hardship necessary for a variance. (*Id.* ¶¶ 32–39.)

After considering the parties' positions, Magistrate Judge Durkin essentially determined that the Zoning Board's action violated the Telecommunications Act of 1996 in at least three ways. First, Magistrate Judge Durkin determined that the Zoning Board lacked substantial evidence to support its determination that it could permissibly deny the requested application without effectively prohibiting the use of new digital technology within the target zone. (R & R (Dkt. Entry 15) at 17–18.) In this regard, Magistrate Judge Durkin noted that Omnipoint presented testimony that no other viable options were available to it and that no contrary evidence was presented. Second, Magistrate Judge Durkin determined that the denial effectively prohibited the digital personal communication services within the target area, a result he believed was specifically forbidden by the Telecommunications Act of 1996. (*Id.*) And third, Magistrate Judge Durkin determined that the Zoning Board's interpretation of the relevant ordinance was erroneous. In particular, Magistrate Judge Durkin noted that the relevant ordinances could be interpreted to allow commercial communication antennae under the definition of "essential services." Moreover, Magistrate Judge Durkin indicated his belief that public utilities were permitted to place cellular communications antennae within a C–N district. As a result, Magistrate Judge Durkin concluded that the ordinance discriminated against functionally equivalent services, a result not permitted under the Telecommunications Act of 1996. (*Id.* at 22–26.) Consistent with these conclusions, Magistrate Judge Durkin recommended that Omnipoint's motion for summary judgment should be granted and that the requested mandamus relief be ordered.

On December 4, 1997, the Zoning Board filed objections to Magistrate Judge Durkin's Report and Recommendation, challenging his determinations that (1) substantial evidence did not exist to support the Zoning Board's action; (2) the relevant ordinance discriminated against functionally equivalent services; and (3) the Zoning Board's decision had the effect of prohibiting the provision of

---

struct and maintain a personal wireless services antenna. 47 U.S.C. § 322(c)(7)(B)(iv).

**6.** According to Section 112.l(1) of the City of Scranton Zoning Ordinance, the Zoning Board had forty-five (45) days to provide a written decision. Under the Telecommunications Act of 1996, however, Omnipoint had only thirty (30) days to institute an action challenging the Zoning Board's decision. 47 U.S.C. § 322(c)(7)(B)(5). Thus, Omnipoint actually filed this action prior to the Zoning Board's final written decision.

wireless services. (Dkt. Entry 16.) Given these objections, the issues raised by the Zoning Board must be considered *de novo.* *See* 28 U.S.C. § 636(b)(1)(C).

## II. DISCUSSION

### A. Scranton Zoning Ordinance

The Scranton Zoning Ordinance divides property into essentially three categories: residential, commercial and industrial. These categories are then subdivided into various districts:

*Residential Districts*

| | |
|---|---|
| C–R | Conservation—Residential District |
| R–1 | Low Density Residential District |
| R–1C | Low Density Residential—Cluster District |
| R–1A | Medium Low Density Residential District |
| R–2 | Medium Density Residential District |
| R–2/O | Medium Density Residential—Office District |
| R–3 | Medium High Density Residential District |

*Commercial Districts*

| | |
|---|---|
| C–D | Downtown Commercial District |
| C–N | Neighborhood Commercial District |
| C–G | General Commercial District |
| I–L | Light Industrial District |
| I–G | General Industrial / Commercial District |

*Industrial Districts*

| | |
|---|---|
| INS–G | General Institutional District |
| INS–L | Light Industrial—Residential District |

(Def's SMF (Dkt. Entry 9) Ex. E, Zoning Ordinance, Article III, § 301.A.) The Ordinance enumerates property "uses" and, for each district, categorizes those uses as (1) permitted by right; (2) conditional use; (3) special exception use; or (4) not permitted. (*Id.* § 306.A.) The Ordinance provides "[i]f a use is clearly not provided by right, by condition or by special exception by this Ordinance with any Zoning District in the City, the use is prohibited in the City." (*Id.* § 105.B); see also § 306.B ("Unless otherwise provided in this Ordinance (including Section 105.B), land or structure shall *only* be used or occupied for a use specifically listed in this Article as

being permitted in the respective zoning district.").

Commercial communications "towers" are *not permitted* in a C–N district, and only allowed through a special exception in C–G, I–L and I–G districts. In relation to commercial communications antennae, the Ordinance provides:

Any such antenna that is attached to an existing business building or a non-residential building of more than 5 stories *shall not be* regulated by this Section, and instead is *permitted by right* without additional regulations under this Ordinance.

(*Id.* Article IV, § 403(13).)

There is a dispute as to whether Omnipoint's antennae fall within the ambit of commercial communications "towers" or commercial communication "antennae." [7] This dispute is largely academic.

Given that the proposed site for Omnipoint's antennae was in a C–N zone, those antennae would not be permitted if considered commercial communication "towers." Even if Omnipoint's antennae were considered commercial communication "antennae," Omnipoint's proposed site was not "an existing business building or a non-residential building of more than 5 stories." Thus, Omnipoint was not "permitted by right" to place its antennae on the proposed site. Moreover, as noted, the Ordinance also provides that if a use is not expressly permitted, it is presumed prohibited. (*Id.* § 105.B.) Because the Ordinance did not provide for the placement of commercial communications antennae on any building of five stories or less, Omnipoint was barred from placing its antennae upon its proposed site. Thus, Omnipoint was required to move for a variance as provided for under the Ordinance.

■ Under the Ordinance, a party seeking a variance bears the burden of demonstrat-

---

7. The Ordinance does not contain a specific definition of commercial communications "towers." It does, however, provide a specific definition for commercial communications "antennae:"

A structure, partially or wholly exterior to a building, used for transmitting or retransmitting electric signals. *Commercial communications towers*, include, but are not limited to, antenna used for transmitting commercial ra-

dio or television signals or cellular telephone communications, but shall be distinct from the use entitled "antenna."
(*Id.* § 202 (emphasis added).) Although this definition of "antennae" incorporates "towers," it also appears to distinguish between a "tower" and an "antenna." Thus, the Ordinance is less than clear on this issue.

ing (1) a unique physical circumstance; (2) an unnecessary hardship created by the physical characteristics of the land; (3) the unnecessary hardship is not self-created; (4) the necessity of a variance for the reasonable use of the property; and (5) a variance will not alter the essential character of the land. (Plf's SMF (Dkt. Entry 9) Ex. E, § 111.-E(3)(b).) The Ordinance specifically provides that a "[m]ere showing of economic hardship shall not by itself justify a zoning variance," but that a party must demonstrate a "prohibitive expense." (*Id.* § 111.E(3)(c).) [8]

## B. The Telecommunications Act of 1996 and Local Zoning Decisions

The Telecommunications Act of 1996 was designed to promote competition in the personal telecommunications industry by limiting the ability of local authorities to regulate and/or control the expansion of telecommunications technology. *See Gearon & Co. v. Fulton County*, 5 F.Supp.2d 1351, 1353 (N.D.Ga.1998); *Cellco Partnership v. Town Plan & Zoning Comm'n*, 3 F.Supp.2d 178, 181 (D.Conn.1998) ("Congress passed the Telecommunications Act in an effort to increase competition in the telecommunications industry by placing limits on local zoning boards' regulation of the placement, construction, and modification of personal wireless service facilities."); *Smart SMR of N.Y., Inc. v. Zoning Comm'n of the Town of Stratford*, 995 F.Supp. 52, 56 (D.Conn.1998) ("Congress passed the Act in order to increase competition in the telecommunications industry."); *Sprint Spectrum L.P. v. Town of Farmington*, No. 97–863, 1997 WL 631104, at *2 (D.Conn. Oct. 6, 1997) (finding that Congress intended to limit local authority in favor of new telecommunication technology); *AT&T Wireless PCS, Inc. v. City Council, Virginia Beach*, 979 F.Supp. 416, 423 (E.D.Va.1997) (finding that the purpose of the Act was to foster competition and remove barriers by prohibiting any favoritism between service providers); *Sprint Spectrum L.P. v. Jefferson County*, 968 F.Supp. 1457, 1461 (N.D.Ala.1997) (noting that the Act was intended to open market and promote competition). Although the Telecommunications Act placed certain restrictions upon local regulatory bodies, it did not completely preempt their ability to control zoning decisions in relation to telecommunications services. *See Town of Farmington*, 1997 WL 631104, at *2. Instead, Congress sought to balance the interests in promoting wireless technology with the rights of the local zoning authorities to maintain the integrity of land use rules. *See* 47 U.S.C. § 332(c)(7)(A) ("Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State

---

**8.** In its application for a variance, Omnipoint contended that it was entitled to a variance because its digital services were an "essential need."(Def's SMF (Dkt. Entry 9) Ex. A.) The Ordinance provides that "essential services" are "permitted by right" as a principal or accessory use in all districts. (Plf's SMF (Dkt. Entry 9) Ex. E, § 306.E.) Within the definition of "essential services" are cable television lines, telephone lines, telephone poles and switching stations. (*Id.* § 306.E(1)(g).) The broad definition of "essential services" provides:

Utility or municipal uses that are necessary for the preservation of the public health and safety and that are routine, customary and appropriate to the character of the area in which they are to be located. See standards in Section 306. Essential services *shall not include* a central sewage treatment plant, a solid waste disposal area or facility, *commercial communication towers*, a power generating station, sludge disposal, utility company offices, storage of trucks or equipment or bulk storage of materials.

(Plf's SMF (Dkt. Entry 9) Ex. E, Art. III (emphasis added).) Because the Ordinance does not specifically provide that cellular or digital services are "essential services" and permitted by right, Omnipoint's claim that its services were an "essential need" is without merit. Magistrate Judge Durkin, in finding that the Ordinance could be interpreted to encompass communications antennae, did not reference § 1.05B, which establishes a presumption against a permitted use if not specifically mentioned. Moreover, the fact that commercial communications towers, which include antennae, are not deemed to be "essential services" weighs in favor of the Zoning Board's construction of its Ordinance. Indeed, deference should be accorded to the Zoning Board's interpretation. *See Borough of Milton v. Densberger*, 719 A.2d 829, 831–32 (Pa. Commw.1998) ("It is, of course, well settled that a zoning board's interpretation of its own zoning ordinance is entitled to great weight and deference from a reviewing court."); *cf. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Accordingly, Magistrate Judge Durkin's determination that communications antennae could be considered as "essential services" will not be adopted.

or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities."); H.R.Conf.Rep. No. 104–458, 104th Cong., 2d Sess. 207–08 (1996), reprinted in 1996 U.S.C.C.A.N. 10, 222 ("The conference agreement creates a new section 704 which prevents Commission preemption of local and State land use decisions and preserves the authority of State and local governments over zoning and land use matters except in the limited circumstances set forth in the conference agreement."). This balancing of interests was accomplished by imposing a few procedural requirements and two substantive limitations on local zoning authorities. To assure that the federally-imposed requirements and limitations were followed, Congress also authorized federal court review of local zoning decisions impacting the provision of wireless communication services. 47 U.S.C. § 332(c)(7)(B)(v).

There are essentially two procedural safeguards contained in the Telecommunications Act. First, it requires that any adverse decision against a personal wireless services provider be in writing. 47 U.S.C. § 332(c)(7)(B)(iii); *Gearon & Co.*, 5 F.Supp.2d at 1354; *AT & T Wireless Servs. of Fla. v. Orange County*, 982 F.Supp. 856, 859 (M.D.Fla.1997); *see also PrimeCo Personal Communications, L.P. v. Village of Fox Lake*, 26 F.Supp.2d 1052, 1062 (N.D.Ill. 1998) (finding that written decision need not be extensive and must only inform an applicant of the decision). Second, the decision must be supported by "substantial evidence." 47 U.S.C. § 332(c)(7)(B)(iii).

There are also two substantive provisions within the Telecommunications Act which protect personal wireless services providers and limit the authority of local zoning authorities. First, State or local government agencies "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). Second, State or local government agencies "shall not unreasonably discriminate among providers of functionally equivalent services." 47 U.S.C. § 332(c)(7)(B)(i)(I).

In this case, Omnipoint contends that the Zoning Board violated both the procedural safeguards as well as the substantive provisions of the Telecommunications Act. First, Omnipoint contends that the Zoning Board lacked substantial evidence to support its written decision denying Omnipoint's request for a variance. Second, Omnipoint argues that the Zoning Board's refusal to grant a variance effectively prohibited the provision of personal wireless services. Finally, Omnipoint asserts that the Zoning Board's denial of the variance constituted unreasonable discrimination between providers of functionally equivalent services.

### 1. *The Zoning Board's Decision Complies with the Procedural Safeguards of the Telecommunications Act*

█ The substantial evidence standard is the traditional standard of review applied to agency determinations:

> [S]ubstantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Under this definition, a court may not displace an agency's "choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Likewise, in the context of the [Telecommunications Act of 1996], the court must affirm a board's decision "even if the court would decide the matter differently."

*Cellular Telephone Co. v. Zoning Bd. of Adjustment of the Borough of Ho–Ho–Kus*, 24 F.Supp.2d 359, 365–66 (D.N.J.1998) (citations omitted); *see also PrimeCo Personal Communications*, 26 F.Supp.2d at 1063 (" 'Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' ") (quoting *Geske & Sons, Inc. v. NLRB*, 103 F.3d 1366, 1374–75 (7th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 46, 139 L.Ed.2d 13 (1997)). The local zoning authority bears the burden of demonstrating that substantial evidence existed to support its denial. *Cellco Partnership*, 3 F.Supp.2d at 182.

■ To enable meaningful judicial review, a written decision cannot simply rely upon conclusory statements, but must provide some evidentiary basis to support each statement. *See Virginia Metronet v. Board of Supervisors of James City County*, 984 F.Supp. 966, 973 (E.D.Va.1998).[9] Moreover, the "generalized concerns" voiced by opponents will not provide substantial evidence for an adverse decision against a personal wireless services provider. *See PrimeCo Personal Communications*, 26 F.Supp.2d at 1063 ("Under this standard, unsupported constituent testimony opposing cellular tower locations generally will not satisfy the substantial evidence test."); *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Township*, 20 F.Supp.2d 875, 880 (E.D.Pa.1998) ("Generalized concerns and conclusive statements within the record about the aesthetic and visual impacts on the neighborhood do not amount to substantial evidence."); *Illinois RSA No. 3, Inc. v. County of Peoria*, 963 F.Supp. 732, 745 (C.D.Ill.1997) ("But under substantial evidence review, the mere existence of opposition is insufficient to support an agency decision against a request. Instead, the agency must rely upon more than a scintilla of evidence that a decision against the request is warranted under the agency's criteria."); *Western PCS II v. Extraterritorial Zoning Auth. of the City and County of Sante Fe*, 957 F.Supp. 1230, 1236 (D.N.M.1997) (finding that "generalized concerns" of five neighbors failed to constitute substantial evidence for denial of requested application); *BellSouth Mobility Inc. v. Gwinnett County*, 944 F.Supp. 923, 928 (N.D.Ga.1996) (holding that generalized concerns do not amount to substantial evidence). *But see AT & T Wireless PCS, Inc. v. City Council of Virginia Beach*, 155 F.3d 423, 430–31 (4th Cir.1998) (suggesting that public outrage standing alone can constitute substantial evidence to deny a zoning request).

In this case, Omnipoint contended that in order to avoid a "gap" in its coverage, its antennae had to be located within a fairly small area in North Scranton, with this entire area being within a C–N or R–1 district. According to Omnipoint's engineers, the topography of the search area dictated the ultimate selection of the subject property. From this evidence, Omnipoint contends that it met its burden to demonstrate the need for a variance and that the Zoning Board improperly denied its request. The issue under the Telecommunications Act is whether substantial evidence exists to support the Zoning Board's determination that Omnipoint had failed to meets its burden of satisfying the requirements for a variance.

■ Although Omnipoint's engineers testified that no other alternative sites existed, Omnipoint failed to adequately address the concerns raised at the hearing. For instance, Omnipoint was questioned whether any alternative sites were available that would fulfill its objectives. Omnipoint's engineer testified that the "search ring" was restrictive and that he considered only one other property within the search ring as a potential site. But Omnipoint did not explain the process for choosing the "search ring." Presumably, the "search ring" was dependent upon the location of adjacent antennae, but Omnipoint did not disclose their placement and why adjustments could not be made so that its "search ring" was not limited to a C–N district or to an area with buildings five stories or less. Nor did Omnipoint refute the assertion of protesters that a commercial communications tower could be constructed in a zoning district within one (1) mile of the "search ring" where such towers were allowed as special exceptions. In regard to potentially moving the site, Omnipoint's engineer testified that "[f]rom an ac-

---

9. Courts have interpreted the requirement for a written decision differently in terms of the effort required from a local zoning authority. *Compare AT & T Wireless PCS, Inc. v. City Council of Va. Beach*, 155 F.3d 423, 429 (4th Cir.1998) (finding that meeting minutes along with a Planning Commission letter were sufficient to satisfy the Telecommunications Act's requirement for a written decision) *with AT&T Wireless PCS, Inc. v. Winston–Salem Zoning Bd. of Adjustment*, 11 F.Supp.2d 760, 764 (M.D.N.C.1998) (hearing transcripts and minutes insufficient to satisfy written decision requirement), *stay denied*, 11 F.Supp.2d 769 (M.D.N.C.1998). Under either approach, the January 18, 1997 letter coupled with the April 28, 1997 findings of fact and conclusions of law, both prepared by the Zoning Board's solicitor, are adequate to satisfy the "written decision" requirement of the Telecommunications Act.

quisition standpoint I would say that if you move in either direction, north, east, south or west you're going to get into a situation where you have redundant coverage because we have a site two miles northeast / southwest that is already providing coverage in that area. So we're filling a hole." (Record (Dkt. Entry 9) Ex. D at 63.)

Omnipoint never presented any evidence, however, that shifting the site by a mile or more would result in a loss of coverage in the targeted area. Omnipoint did submit two maps that allegedly depicted the coverage "gap" as well as the manner in which the "gap" could be covered through placement of Omnipoint's antennae at the proposed site. These maps, however, fail to demonstrate that no alternative sites, where a communications tower would be allowed, could remedy the potential coverage gap. Moreover, there are significant discrepancies between the two maps that are not adequately explained. For instance, covered areas in the first map are suddenly no longer covered in the second map, despite additional antennae at the proposed site. In short, these maps fail to demonstrate that any movement of the proposed sites was impossible.

As noted above, Omnipoint was specifically questioned at the hearing as to whether a 100 foot tower placed in a nearby commercial or industrial district would cure the coverage problem. (Id. at 63.) Omnipoint never addressed the potential viability of such a "tower" solution. There were also concerns expressed that Omnipoint had created its own problem through the manner in which its "cells" were designed. In this regard, the alleged duplicative coverage that would result from moving the proposed site arose

from another "cell" that had not even been constructed. (Id. at 63–65.)

In this case, Omnipoint shouldered the burden of proving an unnecessary hardship which was not self-created. Since it was Omnipoint's design of its own system that placed the proposed antennae in a C–N zone, the Zoning Board's decision that the claimed hardship was self-created was supported by substantial evidence. Omnipoint's failure to rule out other alternative sites also afforded substantial evidence for the Zoning Board's decision. Omnipoint's objection that a move to a site suggested by a local citizen would result in "redundant coverage" is a tacit concession that the coverage "gap" could be avoided by such a move. "Redundant coverage" does not mean an absence of coverage; it simply suggests a less than optimum arrangement of antennae. Although the coverage would result in some duplication, Omnipoint never stated that the "coverage gap" could not be filled by moving its antennae to a permitted location.[10] In this regard, Omnipoint failed to address whether its coverage problems could be avoided through the construction of a tower in an area where it would be allowed as a special exception.[11]

The conclusion that there is substantial evidence supporting the Zoning Board's decision is buttressed by the fact that many of Omnipoint's cells had not even been constructed at the time of the zoning hearing. The record fails to demonstrate that Omnipoint was unable to shift these cells in a manner to assist in compliance with relevant zoning provisions. As such, Omnipoint's self-created restricted search area will not, standing alone, override the authority of the Zoning Board to enforce the Ordinance.

10. To this extent, the Ordinance provides that "economic hardship" is not sufficient to justify a variance. Thus, Omnipoint cannot complain that the proposed movement of the proposed site would result in additional costs. In order for such a complaint to become relevant for variance purposes, Omnipoint would have to demonstrate that the proposed "redundant coverage" would be a "prohibitive expense." No such showing has been made on this record.

11. The requirements for a special exception are less stringent than the requirements for a variance. Under the Ordinance, a party seeking a

special exception must present "adequate evidence" that the proposed use (1) will comply with existing ordinances or laws; (2) will not result in increased traffic congestion; (3) will not create a significant public safety hazard; (4) will adequately manage storm water; (4) will not significantly negatively affect the desirable character of an existing residential neighborhood; (5) will provide adequate site design planning; and (6) will not seriously threaten compliance with environmental protection provisions. (Def's SMF (Dkt. Entry 9) Ex. E, Zoning Ordinance, Article I, § 119C.)

In *AT & T Wireless Services of Florida v. Orange County*, 23 F .Supp.2d 1355 (M.D.Fla.1998), AT & T contended that the county had violated the Telecommunications Act when it denied a request for a variance to permit it to build a 99 foot concealed communications tower in the steeple of a church in a residential area. As in this case, AT & T argued that "its desire to have a tower of a useful height within its designated search ring [was] a hardship sufficient to justify a variance." *Id.* at 1360. The court noted that "the generalized need for a cellular service area does not fit well into traditional variance analysis." *Id.* In considering AT & T's arguments, the court concluded:

> AT & T seeks to avoid [the setback requirement's] effect simply because additional cellular capacity is desirable in this area. The Tower Ordinance is a legislative balancing of the accommodation of growing cellular demand with public safety and general welfare. To upset that balance, AT & T must show more than a demand for additional service and a desire to build another tower. If market forces for improved and expanded service were enough to avoid the setback requirements, the County would be obliged to approve every application, virtually without regard to the impact on the surrounding area. *Even if the Court were to reject the Board's findings regarding the state of AT & T's efforts to locate towers elsewhere in or near the search ring, there would be no proof of hardship of the kind justifying a variance.*

*Id.* at 1361 (emphasis added). Likewise in this case, Omnipoint has failed to demonstrate that traditional variance principles must give way to an inability to find a suitable site within a proposed restricted search area where the tight parameters of the search area have not been substantiated.

In short, Omnipoint was required to present evidence that (1) the coverage "gap" could not have been cured by moving the proposed site; or (2) no other viable alternatives, such as a communications tower, existed to cure the coverage "gap." Although these matters were raised at the zoning hearing, Omnipoint failed to address them. It is not fair to impose on local citizens the obligation of proving that there are no alternative viable sites. Those residing in a residential area should not be expected to undertake the exercise of bringing in experts and conducting studies. The Ordinance imposes the burden on the applicant for a variance to prove its case, and that burden must necessarily extend to explaining why alternatives will not work, especially where, as here, the objectors question the availability of other locations and suggest that the site chosen by the applicant is simply the least expensive site, not the only site. Otherwise, zoning ordinances will be overcome by the well-financed and organized personal wireless services providers. As the Fourth Circuit recently explained:

> In all cases of this sort, those seeking to build will come armed with exhibits, experts, and evaluations. Appellees, by urging us to hold that such a predictable barrage mandates that local governments approve applications, effectively demand that we interpret the Act so as always to *thwart average, nonexpert citizens;* that is, to thwart democracy. The district court dismissed citizen opposition as "generalized concerns." Congress, in refusing to abolish local authority over zoning of personal wireless services, categorically rejected this scornful approach.

*AT & T Wireless PCS, Inc.*, 155 F.3d at 431.

In this case, concerns were expressed at the zoning hearing regarding potential alternative sites for the antennae or a tower to overcome the coverage gaps. These concerns directly related to whether Omnipoint had met its burden of demonstrating an unnecessary hardship if it could not locate its antennae on a two-story residential building. Omnipoint bore the burden to adequately address these concerns, and failed to do so.

Under these circumstances, there was substantial evidence to support the Board's determination that Omnipoint had failed to demonstrate an unnecessary hardship. *See AT & T Wireless Servs. of Fla.*, 23 F.Supp.2d at 1361; ("The hardship described by AT & T in meeting service levels (no matter how well documented) is simply not the kind of hardship traditionally recognized as grounds for a variance. Impairment of a particular

proposed activity is not a unique hardship to the property."); *Gearon & Co.*, 5 F.Supp.2d at 1354–55 (finding denial of variance proper where personal communication services provider failed to demonstrate that there were no other available sites that could be utilized to cure the gaps in coverage); *Sprint Spectrum L.P. v. Willoth*, No. 97–cv–6473T, 1998 WL 84602, at *4 (W.D.N.Y. Feb.19, 1998) (denial of variance application for three towers was proper where evidence demonstrated that one strategically located tower would be sufficient to eliminate gaps in coverage).[12] Therefore, the objection to Magistrate Judge Durkin's finding that the Board lacked substantial evidence to support its finding will be sustained.

### 2. *Prohibiting Personal Wireless Services*

■ The Telecommunications Act of 1996 bars any regulatory conduct that prohibits or has the effect of prohibiting personal wireless services. 47 U.S.C. § 322(c)(7)(B)(i)(II). Magistrate Judge Durkin determined that the Zoning Board's refusal to allow Omnipoint to place its antennae within the C–N district violated this provision of the Telecommunications Act because it effectively prohibited a new personal communications service. In other words, the Zoning Board's denial created a "gap" in Omnipoint's coverage, thereby prohibiting the service within that particular area. Magistrate Judge Durkin determined that the effect of this single decision was sufficient to violate the Telecommunications Act.

■ It is well-settled, however, that a single decision by a local regulatory agency is insufficient to demonstrate a prohibition on personal wireless communication services. The courts have uniformly held that

§ 322(c)(7)(B)(i)(II) is violated only where the local regulatory agency creates a general ban against all personal wireless communication services. *See* H.R.Conf.Rep. No. 104–458, 104th Cong., 2d Sess. 208 (1996), 1996 U.S.C.C.A.N. 124, 222 ("It is the intent of this section that bans or policies that have the effect of banning personal wireless services or facilities not be allowed and that decisions be made on a case-by-case basis."); *Flynn v. Burman*, No. 98–11178, 1998 WL 848000, at *7 (D.Mass. Nov.19, 1998) ("[T]he Act … does not pertain to individual decisions on particular applications, but rather to a town's 'general ban or policy' prohibiting all personal wireless services."); *National Telecommunications Advisors, LLC v. Board of Selectmen of the Town of West Stockbridge*, No. 98–30119, 1998 WL 822102, at *4 (D.Mass. Nov.19, 1998) (same); *Cellco Partnership*, 3 F.Supp.2d at 184–85 ("[A] zoning commission violates section 332(c)(7)(B)(i)(II) only if it has a general ban or policy that prohibits or has the effect of prohibiting the provision of personal wireless services."); *Smart SMR of N.Y.*, 995 F.Supp. at 57 ("It must be demonstrated that the Commission has a general policy against granting special case permits for personal wireless service facilities in residential areas."); *AT & T Wireless Servs. of Fla.*, 994 F.Supp. at 1429 ("It is plain from the express language of the Act, and the legislative history, that Congress did not obviate the need to comply with local government requirements, as long as the requirements do not serve to ban towers entirely."); *Virginia Metronet*, 984 F.Supp. at 971 ("[Congress] intended to limit general bans of personal wireless services, or policies which have the effect of prohibiting personal wireless services.").[13] Thus, a moratorium

---

12. Admittedly, the substantial evidence test does not easily apply to this case. Because Omnipoint bore the burden, the failure to present evidence would support the Board's refusal to grant a variance.

13. In *Virginia Metronet*, the court noted that neutral policies that are objectively administered may still have the effect of prohibiting personal wireless service provided that "all possible sites in a given area will be rejected" as a result of the neutral policy. *Virginia Metronet*, 984 F.Supp. at 971; *see also Smart SMR of N.Y., Inc.*, 995 F.Supp. at 58 ("By generally disfavoring the ap-

proval of placing wireless service facilities in all residential zones, and instead of adhering to a policy whereby the Commission would consider each such petition on a case-by-case basis, we therefore find that the Commission's policy had the effect of prohibiting the provision of personal wireless services."). The Zoning Board has presented new evidence that another provider of personal wireless services (Nextel, Communications, Inc.) has been granted a variance to build three, twelve foot antennae on top of a ten-story condominium unit in a residential district. (Dkt. Entry 21.) Although the Ordinance prohibits the

against the expansion of personal wireless services would violate the Telecommunications Act. *See Sprint Spectrum L.P.,* 968 F.Supp. at 1468. A single denial, even where it results in a gap in services, does not constitute in a prohibition against personal wireless services. *See AT & T Wireless Servs. of Fla.,* 982 F.Supp. at 860 (M.D.Fla.1997) ("While the Board's action certainly prohibited the construction of this proposed tower, the record does not indicate general hostility to *any* tower in the area."); *Sprint Spectrum, L.P. v. City of Medina,* 924 F.Supp. 1036, 1040 (W.D.Wash.1996) ("This argument, however, would imply that federal law bars *any* rejection by local government of a wireless communications provider's application for a zoning variance. That is contrary to the [Act], which expressly preserves city and state zoning authority."). As recently noted by one court:

> Were courts to hold that merely because there are some gaps in wireless service in an area ... the public interest necessarily tips the balance in favor of allowing a variance, local boards would be obliged to approve virtually every application which would improve service, without regard to its impact on the surrounding areas. That simply cannot be the case. Such a result would vitiate state land use law and render irrelevant the factors considered in a variance application. As long as the Board's decision was not an attempt to prohibit personal wireless service altogether ... local land use law is controlling.

*Cellular Telephone Co.,* 24 F.Supp.2d at 373. ■ The Zoning Board has presented evidence that it has approved the placement of antennae for another wireless service provider, Nextel Communications, Inc.[14] Although Nextel sought to place its antennae in a residential district, it found a residential building in excess of five stories, *i.e.,* a condominium apartment complex. While commercial communication antennae are generally not permitted on residential buildings, Nextel was able to obtain a variance. Thus, it is apparent that there is no general ban or prohibition against wireless communication services in the City of Scranton. Moreover, the Ordinance's preference for placement of communication antennae in non-residential buildings of more than five (5) stories does not effect a prohibited ban on personal wireless services. *See Sprint Spectrum L.P. v. Town of North Stonington,* 12 F.Supp.2d 247, 256 (D.Conn.1998) (Town's preference that communications antennae be located on existing structures rather than newly-constructed towers does not constitute a ban on personal wireless services).

In short, there is no evidence that the Zoning Board had a general ban against personal wireless services. Omnipoint has pointed to a single decision that denied the requested services. Even if this decision results in a coverage gap, Omnipoint is not entitled to prevail because it has not presented any evidence that the Zoning Board uniformly denies all requests for commercial communications antennae. *See Cellular Telephone Co.,* 24 F.Supp.2d at 375 n. 11 ("Simply because the proposed site was the only site available for lease or purchase at that time does not mean that the Board was obliged to grant the conditional use variance or risk running afoul of the [Telecommunications Act].")). Therefore, the objection to Magistrate Judge Durkin's finding that the Board's action prohibited the provision of wireless communication services will be sustained.

**3. *Unreasonable Discrimination Between Functionally Equivalent Providers***

■ A local regulatory body may not unreasonably discriminate between providers of

---

placement of commercial communications antennae on residential buildings, Nextel applied for and received a variance. Thus, the Ordinance's prohibition against commercial communication antennae on residential buildings or on non-residential or business buildings of five stories or less does not result in a general ban, but does limit the areas in which the antennae may be placed. This is permissible under the Telecommunications Act. In other words, the Ordinance properly placed neutral restrictions upon the placement of commercial communication an-

tennae and then allows a case-by-case analysis to determine whether a variance is warranted.

**14.** On March 31, 1998, the Board moved for leave to present this evidence. (Dkt. Entry 21.) This motion will be granted. Even if this motion were denied, however, this decision would remain the same as Omnipoint has failed to demonstrate that the Zoning Board's decision resulted in a general ban of personal wireless services.

functionally equivalent services. 47 U.S.C. § 322(c)(7)(B)(i)(I). Omnipoint does not contend that other wireless service providers have been treated more favorably than it. Instead, Omnipoint argues that a public utility which provides conventional telephone service through telephone lines would be deemed to be providing an essential service and would be permitted to place its telephone lines in a C–N district. Thus, Omnipoint contends that although it provides similar, albeit new and more technologically advanced, communication services, the Zoning Board has impermissibly determined that its provision of personal communication services is not an essential service, while the conventional service provided by a public utility is an essential service. The result of this distinction is that public utilities may erect their communications equipment (telephone poles and wires) by right, while Omnipoint is denied the right to erect its communications equipment (antennae). Omnipoint therefore argues that the treatment of public utilities in the Ordinance results in unreasonable discrimination between providers of functionally equivalent services, *i.e.*, communication services.

Omnipoint's argument rests upon a faulty premise: that conventional telephone services (public utilities) and personal wireless services are functionally equivalent. The legislative history makes clear that this provision of the Telecommunications Act was intended to apply *only* to personal wireless services providers. H.R.Conf.R. No. 104–458, 104th Cong., 2d Sess. 208 (1996), reprinted in 1996 U.S.C.C.A.N. 11, 222 ("While utilizing the term 'functionally equivalent services' the conferees are referring only to personal wireless services as defined in this section that directly compete against one another.") Moreover, the Telecommunications

Act itself defines personal wireless services as "commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services." 47 U.S.C. § 332(c)(7)(C). Thus, Omnipoint's reliance upon the right of conventional telephone providers (public utilities) to place its poles and wires in any district is not relevant to this inquiry under the Telecommunications Act.

■■■ Omnipoint's contention that the zoning exemption applicable to "public utilities" should be extended to it fails for other reasons. First, the Pennsylvania Supreme Court has held that cellular service providers are not "public utilities," which is defined to mean:

> [B]usiness activity regulated by a government agency in which the business is required by law to: 1) serve all members of the public upon reasonable request; 2) charge just and reasonable rates subject to review by a regulatory body; 3) file tariffs specifying all of its charges; and 4) modify or discontinue its service only with the approval of the regulatory agency.

*Crown Communications v. Zoning Hearing Bd. of Borough of Glenfield,* 550 Pa. 266, 705 A.2d 427, 431–32 (Pa.1997). Because personal wireless services providers are not "public utilities," they do not qualify for exemptions from local zoning regulations. *Id.* Significantly, one of the personal wireless cellular providers in the *Crown Communications* case was Bell Atlantic Mobile Systems, Inc., a subsidiary of Bell Atlantic, which the Supreme Court noted was a public utility. This relationship did not qualify Bell Atlantic Mobile for exemption from local zoning requirements. It therefore follows that Omnipoint is not a "public utility" that is exempted from Scranton's zoning ordinance.[15]

---

**15.** Omnipoint's contention that providing public utilities with the right to construct and maintain conventional phone lines results in discrimination between providers of functionally equivalent services when the Zoning Board refuses to permit unregulated placement of wireless communications antennae is without merit. The Telecommunications Act was intended as a means to promote competition among personal wireless services, not conventional phone services. The Telecommunications Act governs the "placement, construction, and modification of personal

wireless facilities." The fact that telephone poles and wires are allowed as of right in all districts does not divest a local regulatory agency of the authority to regulate the placement of antennae for personal wireless services. To hold otherwise would effectively destroy the ability of State and local zoning authorities to regulate, within the bounds of the Telecommunications Act, the "placement, construction, and modification of personal wireless facilities." In short, the Telecommunications Act does not require a local regulatory body to permit without limitation

Even if the treatment of public utilities were to come into play and it were determined that public utilities provided functionally equivalent services, the mere fact that a provider of functionally equivalent services has received favorable treatment, standing alone, will not result in a violation of the Telecommunications Act. *See Cellco Partnership*, 3 F.Supp.2d at 184 ("A zoning commission, however, does not violate the Telecommunications Act solely because it denied a personal wireless service provider's application for a special permit, even though it had granted a permit in favor of the provider's competitor."). Instead, it must be demonstrated that any difference in treatment was unreasonable. *See AT & T Wireless PCS, Inc.*, 155 F.3d at 427 (finding that local regulatory agency may discriminate between providers so long as such discrimination is reasonable); *Cellular Telephone Co.*, 24 F.Supp.2d at 374 ("Moreover, even if some sort of unequal treatment could be discerned, the unequal treatment must be unreasonable."). As explained in the House Conference Report:

> "The conference agreement creates a new section 704 which prevents [Federal Communications] Commission preemption of local and State land use decisions and preserves the authority of State and local governments over zoning and land use matters except in the limited circumstances set forth in the conference agreement.... The intent of the conferees is to insure that a State or local government does not in making a decision regarding the placement, construction and modification of facilities of personal wireless services described in this section *unreasonably favor one competitor over another.* The conferees also intend that the phrase 'unreasonably discriminate among providers of functionally equivalent services' will provide localities with the *flexibility to treat facilities that create different visual, aesthetic, or safety concerns* differently to the extent permitted under the generally

applicable zoning requirements even if those facilities provide functionally equivalent services. For example, the conferees do not intend that if a State or local government grants a permit in a commercial district, it must also grant a permit for a competitor's 50–foot tower in a residential district."

H.R.Conf.Rep. No. 104–458, 104th Cong., 2d Sess. 208 (1996), 1996 U.S.C.C.A.N. 124, 221–22 (emphasis added); *see also Orange County*, 994 F.Supp. at 1430 ("It is within the prerogatives of a local government to determine that a tower (or steeple) is too imposing for a particular neighborhood.").

In this case, the Zoning Board had a reasonable basis to provide different rules for public utilities. Pennsylvania law provides for special regulation of public utilities by the Pennsylvania Public Utilities Commission. 53 Pa.Cons.Stat.Ann. § 10619. To this extent, the Public Utility Commission determines whether a public utility is entitled to an exception from local zoning ordinances. *See, e.g., O'Connor v. Pennsylvania Public Utility Com'n*, 136 Pa.Cmwlth. 119, 582 A.2d 427, 433 (1990). A public utility must apply to the Public Utility Commission for such an exception, the Commission then conducts a hearing, and its decision may be appealed to the Pennsylvania Commonwealth Court. *Id.* In short, the Public Utility Commission, not the local zoning authority, effectively determines whether a variance or exception is required.[16]

As noted, personal wireless service providers are not public utilities and, therefore, not governed by the Public Utility Commission. Because personal wireless service providers are not regulated and governed by the Public Utility Commission, local regulatory bodies may reasonably apply zoning provisions to wireless service providers. Accordingly, the objection to Magistrate Judge's Durkin's determination that the Zoning Board unreasonably discriminated against providers of functionally equivalent services will be sustained.

---

wireless communications antennae and/or towers simply because conventional telephone poles are permitted.

**16.** The Ordinance recognizes that the Zoning Board lacks the ability to enforce its own provisions in relation to public utilities. (Def's SMF (Dkt. Entry 9) Ex. E., Zoning Ordinance, Article I, § 114.)

### III. CONCLUSION

There is substantial evidence to support the Zoning Board's determination. Omnipoint contended that the uniqueness of the topography of the City of Scranton caused the potential cell sites to be extremely limited. The record demonstrates, however, that Omnipoint was directly questioned as to whether its coverage gap could be cured if the proposed antennae were moved to a location outside the search ring. Because Omnipoint bore the burden of demonstrating an unnecessary hardship for a variance, Omnipoint was required to present evidence that alternate sites or methods were not available. Omnipoint failed to do so. Thus, the Zoning Board's determination that Omnipoint failed to meet its burden is supported by substantial evidence.

Moreover, Omnipoint presented no evidence concerning the manner in which the search areas were initially determined. In other words, Omnipoint presented no evidence that its alleged need to use a two-story residential building was not self-created. Thus, the Zoning Board's determination that Omnipoint failed to meet its burden is supported by substantial evidence.

The Zoning Board did not prohibit or effectively prohibit the provision of personal wireless services when it denied Omnipoint's application. There is no evidence that the Zoning Board had a general ban against the placement and construction of personal wireless services antennae. To the contrary, the Zoning Board has demonstrated that it does allow for such placement and construction.

Finally, the record fails to demonstrate that the Zoning Board unreasonably discriminated against providers of functionally equivalent services. Omnipoint's argument that the Zoning Board committed unreasonable discrimination by permitting public utilities to erect conventional telephone lines as a matter of right while limiting the placement of antennae by personal wireless services providers is without merit. The Telecommunications Act applies only to personal wireless services. Thus, the fact that the Zoning Board may treat conventional telephone services differently does not constitute unreasonable discrimination under the Telecommunications Act. Furthermore, a reasonable basis exists for different treatment of public utilities and personal wireless services providers. More fundamentally, Omnipoint has simply failed to demonstrate that the Zoning Board has treated providers of *wireless* personal services differently. Absent such evidence, there can be no finding that the Zoning Board unreasonably discriminated between providers of functionally equivalent services.

 For the foregoing reasons, the objections to Magistrate Judge Durkin's Report and Recommendation will be sustained and Omnipoint's motion for summary judgment will be denied. Because the Zoning Board is entitled to judgment in its favor, summary judgment will be granted in favor of the Zoning Board.[17]

---

17. The Third Circuit has cautioned that summary judgment should not be granted *sue sponte* to the non-moving party without notice and an opportunity to be heard. *See American Flint Glass Workers Union, AFL—CIO v. Beaumont Glass Co.*, 62 F.3d 574, 578 (3d Cir.1995); *see also Chambers Dev. Co. v. Passaic County Utilities Auth.*, 62 F.3d 582, 584 n. 5 (3d Cir.1995) ("Although authority has developed to allow a court to grant summary judgment to a non-moving party ..., a judgment cannot be entered without first placing the adversarial party on notice that the court is considering a *sua sponte* summary judgment motion. The court must also provide the party with an opportunity to present relevant evidence in opposition to that motion."). This admonition, however, is not applicable to this case. The Telecommunications Act essentially requires that a federal district court act in an appellate capacity, *i.e.*, to determine whether a written decision of a local zoning authority complies with the procedural safeguards and the substantive provisions of the Telecommunications Act. As in other cases involving review of agency determinations, summary judgment is the appropriate mechanism for final resolution. To refrain from granting summary judgment in favor of the Zoning Board would be a procedural formality that would serve no purpose other than to further delay these proceedings. Given that there are no material facts in dispute and that

the Zoning Board is entitled to judgment as a matter of law, summary judgment will be entered in favor of the Zoning Board.